UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAY RAJA,

    Plaintiff,

v.                                                               Case No. 8:08-cv-2521-T-23TGW

ENGLEWOOD COMMUNITY
HOSPITAL, et al.,

    Defendants.
_____/

**O R D E R**

The plaintiff, Jay Raja, sues Englewood Community Hospital, Inc., ("Englewood Hospital"); HCA, Inc., ("HCA"); Robert Meade; Wendy Brandon; Joseph Chirillo, Jr.; Kenneth Pfahler; Todd Chace; Robert Gutierrez; Cynthia Davis; and Anthony DiTomaso. The plaintiff asserts claims for racial discrimination in violation of 42 U.S.C. § 1981 (Count I); conspiracy to violate Section 1981 in violation of 42 U.S.C. § 1985(3) (Count II); breach of contract (Count III); tortious interference with a business relation (Count IV); defamation (Count V); unfair trade practices (Count VI); negligent hiring, training, supervision, and retention (Count VII); and for a "declaratory judgment regarding compliance with medical staff bylaws" (Count VIII).

Procedural Background

A shotgun pleading, the initial complaint (Doc. 1) comprises fourteen counts and 417 paragraphs. A January 29, 2009, order (Doc. 17) dismisses the complaint and directs the plaintiff to submit an amended complaint that "strictly compl[ies] with Rules

5.2, 8, and 10(b)," Federal Rules of Civil Procedure.  Following the plaintiff's amending the complaint (Doc. 23), the defendants moved (Doc. 30) to dismiss.  With leave of court, the defendants' motion comprises seventy-two pages, and the plaintiff's memorandum in opposition (Doc. 38) spans sixty-two pages.  Notably, the plaintiff's memorandum acknowledges that six counts of the amended complaint "do not appear to be viable as stated" and that two of the counts "appear to be outside the applicable statute of limitations as currently pleaded."  In other words, "[t]he plaintiff caused the defendant to expend valuable time, effort, and money and scarce pages responding to matters that the plaintiff summarily dismisses.  To remedy this disproportion and to suggest the benefits of more straightforward litigation," a June 1, 2009, order (Doc. 39) strikes the amended complaint in its entirety.  In compliance with the June 1, 2009, order, the plaintiff submits the present iteration of the complaint (Doc. 40), which omits the admittedly meritless claims.  The defendants move (Doc. 41) to dismiss the amended complaint, and the plaintiff responds (Doc. 42) in opposition.

## Factual Background

### A. The Parties

A gastroenteroligist at Englewood Hospital, the plaintiff "is of East Indian ancestry and is not white."  (Doc. 40, ¶ 9)  The defendant Englewood Hospital is a for-profit, Florida corporation in Englewood, Florida.  A Delaware corporation, HCA owns and operates hospitals across the United States.  Robert Meade served as the Chief Executive Officer ("CEO") of Englewood Hospital from 1998 until 2005.  Wendy Brandon served as CEO of Englewood Hospital from 2005 until August, 2008.  The remaining defendants Joseph Chirillo, Todd Chace, Kenneth Pfahler, Robert Gutierrez,

- 2 -

Cynthia Davis, and Anthony DiTomaso are licensed physicians with clinical privileges at Englewood Hospital.

### B. Hospital Management

HCA owns and operates Englewood Hospital. The "Medical Staff" of Englewood Hospital comprises "licensed physicians who have clinical privileges at Englewood Hospital." (Doc. 40, ¶ 27) The Medical Staff includes both hospital-employed physicians and independent physicians. Acting "independently of the hospital on many issues," the Medical Staff governs itself pursuant to the Englewood Community Hospital Medical Staff Code of Bylaws (the "bylaws"). The plaintiff alleges that the bylaws constitute a binding contract between Englewood Hospital and each individual member of the Medical Staff. Under the bylaws, the Medical Staff elects officers, who constitute the Medical Executive Committee for Englewood Hospital. The Medical Staff also elects a Department Head for each department.

### C. Recruiting a Direct Competitor

The plaintiff's grievances begin in 2001, when Meade approached the plaintiff about the plaintiff's use of conscious sedation on his patients. The plaintiff alleges that conscious sedation is "effective, less expensive to patients and third-party payers, less invasive, subject to far fewer possible complications, and was much safer for patients." (Doc. 40, ¶ 36) Meade attempted to coerce the plaintiff "into using the Hospital's anesthesia service to provide anesthesia to all of [the plaintiff's] patients during all of [the plaintiff's] endoscopic procedures, as a means of producing additional income for Englewood Hospital and HCA." (Doc. 40, ¶ 37) Attempting to bribe the plaintiff, Meade offered to purchase equipment for the plaintiff's practice, but the plaintiff refused. The

- 3 -

plaintiff alleges that Meade "was attempting to have [the plaintiff] commit Medicare fraud and to aid and abet the Hospital in submitting claims to the federal Medicare Program for medical services that [the plaintiff] believed to be completely unnecessary for his patients." (Doc. 40, ¶ 42) The plaintiff refused to comply with Meade's demand.

"[A]s a direct result of [the plaintiff's] refusal to cooperate with Mr. Meade and the Hospital in their scheme to use unnecessary anesthesia services, they began to attempt to recruit other gastroenterologists to come into the Englewood Hospital service area to compete with [the plaintiff]." (Doc. 40, ¶ 46) Meade told Gary Reynolds, the then-Chief of Staff, that Meade planned to "destroy" the plaintiff's referral base "by turning all the primary care physicians in the area against [the plaintiff]." (Doc. 40, ¶ 48) Meade "falsely stat[ed] to primary care and other physicians in the area on numerous occasions that [the plaintiff] was a 'bad doctor.'" (Doc. 40, ¶ 49) Meade attempted "to wrongfully remove [the plaintiff's conscious sedation privileges" and threatened endoscopy nurses with termination if the nurses refused to write false complaints against the plaintiff. (Doc. 40, ¶¶ 52, 53)

Despite the presence of seven board certified gastroenterologists practicing in Englewood, Florida, Meade successfully recruited DiTomaso, a white gastroenterologist, to apply for clinical privileges at the hospital. Meade, HCA, and Englewood Hospital offered DiTomaso a "'practice support guarantee' of between $350,000.00 and $450,000.00" to persuade DiTomaso to obtain clinical privileges at the hospital. (Doc. 40, ¶ 59) The plaintiff alleges that Meade and Englewood Hospital recruited DiTomaso "in order to damage [the plaintiff's] practice, in order to discriminate against him, and in order to have a gastroenterologist that Mr. Meade could force to use

the Hospital's anesthesiology service." (Doc. 40, ¶ 54)  DiTomaso obtained clinical privileges at Englewood Hospital "and began treating gastroenterology patients, in direct competition with [the plaintiff]."  (Doc. 40, ¶ 62)

Meade and a member of the Englewood Hospital's board of trustees instructed several primary care physicians to refer patients to DiTomaso and to cease referring patients to the plaintiff.  (Doc. 40, ¶ 65)  To deter the nurses' working with the plaintiff, Meade and Englewood Hospital threatened to terminate any endoscopy nurse whose patient suffered complication during a procedure performed by the plaintiff.  (Doc. 40, ¶ 68)  Meade "falsely claimed that his and the Hospital's actions were based on the concern that [the plaintiff] was providing sub-standard care."  (Doc. 40, ¶ 70)

### D. Allegations of Discrimination

Although replete with conclusory allegations of discrimination, the complaint contains only sparse factual allegations from which to infer the defendants' discriminatory intent. Nevertheless, Count I includes the following allegations of discrimination.  The plaintiff alleges that Meade and Englewood Hospital "covered up for and protected" Dr. Pfahler, a white physician who competes directly with the plaintiff's wife. (Doc. 40, ¶ 85)  The plaintiff conclusorily alleges that Meade covered for Pfahler to promote the interests of a white physician over the interests of the plaintiff's wife.

On March 29, 2004, Dr. Wessels, a physician and employee of Englewood Hospital, "made racist and discriminatory comments regarding minority physician[s], East Indians in particular, and about [the plaintiff] specifically."  Wessels stated, "We are tired of Raja and want a white man."  (Doc. 40, ¶ 160)  Although alleging that a

- 5 -

physician reported the remark to the plaintiff, the complaint fails to allege that anyone reported the remark to a supervisor or to anyone other than the plaintiff.

The complaint alleges that between 2004 and 2007, Neville Daniels, an African-American employee of the hospital, "was the subject of constant harassment and discriminatory actions based on his race." (Doc. 40, ¶ 166) The complaint alleges that Daniels documented the abuse in a written statement he gave to the plaintiff. Neither the plaintiff nor Daniels reported the incidents to anyone other than the plaintiff.

In 2007, "anesthesiologists and employees in the Anesthesiology Department of Englewood Hospital made derogatory statements and ethnic jokes based on race, in the presence of nurses and physicians, including those of racial minorities." (Doc. 40, ¶ 168) The plaintiff complained to the defendant Brandon about the statements, but Brandon "advised [the plaintiff] that there was nothing she could do." (Doc. 40, ¶ 168)

Finally, the complaint alleges that Meade referred to DiTomaso as "the Great White Hope" while recruiting DiTomaso to apply for clinical privileges at the hospital. (Doc. 40, ¶ 169) The plaintiff conclusorily alleges that DiTomaso "was specifically recruited based on his race, in order to discriminate against other gastroenterologists of racial minorities." (Doc. 40, ¶ 169)

The remainder of the allegations in the complaint either fail to mention race or are conclusory and due to be ignored. For example, the plaintiff conclusorily alleges that he was "discriminated against and held up to ridicule and belittlement based on his minority"; that "[t]here was a pattern of systematic discrimination against racial minorities at Englewood Hospital that was reported to and known to HCA"; that the "named defendants . . . discriminated against physicians, including specifically [the

plaintiff], based on their race"; and that Meade and Englewood Hospital "concealed adverse incidents concerning white physicians while vigorously pursuing false allegations against [the plaintiff], a non-white physician." (Doc. 40, ¶¶ 89, 153-54) Pursuant to Ashcroft v. Iqbal, each conclusory allegation is ignored. 127 S. Ct. 1937, 1951 (2009) ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

### The Section 1981 Claims

The plaintiff sues Meade, Brandon, Chirillo, Gutierrez, DiTomaso, Englewood Hospital, and HCA for alleged violations of 42 U.S.C. § 1981. To state a claim for violation of Section 1981, the plaintiff must allege that "(1) he . . . is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (in this case, the making and enforcing of a contract)." Rutstein v. Avis Rent-A-Car Systems, Inc., 211 F.3d 1228, 1235 (11th Cir. 2000). The plaintiff meets the first element by alleging that he "is of East Indian ancestry and is not white." (Doc. 40, ¶ 9) But the plaintiff fails to allege any fact supporting the defendants' intent to discriminate on the basis of race.

The claim against DiTomaso perhaps best demonstrates the tenuousness of the plaintiff's discrimination claims. The plaintiff alleges that DiTomaso told patients that the plaintiff is a "bad doctor" and "urged" patients to seek care from DiTomaso instead. But no allegation of DiTomaso's racial animus ensues. The plaintiff conclusorily alleges that DiTomaso "was specifically recruited based on his race, in order to discriminate

against other gastroenterologists of racial minorities." (Doc. 40, ¶ 169) However, the plaintiff fails to allege how the Hospital's purported motive for recruiting DiTomaso demonstrates DiTomaso's intent to discriminate on the basis of race.

The plaintiff's other apparent discrimination claims—concerning the defendants' discriminatory enforcement of the bylaws and disparate treatment of the plaintiff—are equally threadbare. The plaintiff alleges that Meade conspired with others to substitute DiTomaso as the hospital's primary gastroenterologist; however, the complaint alleges (with specificity unmatched elsewhere in the complaint) that Meade began recruiting DiTomaso "as a direct result of [the plaintiff's] refusal to cooperate with Mr. Meade and the Hospital in their scheme to use unnecessary anesthesia services." (Doc. 40, ¶ 46) Indeed, the plaintiff alleges that Meade recruited DiTomaso "in order to have a gastroenterologist that Mr. Meade could force to use the Hospital's anesthesiology service." (Doc. 40, ¶ 54)

The plaintiff alleges that Chirillo, "as President of the Medical Staff (Chief of Staff), used the Englewood Hospital [Quality Assurance {"QA"}] Committee to commence groundless, meritless, and unfounded investigations against [the plaintiff] for no other reason than to discriminate against him, to cause damage to his professional reputation, and to cause damage to his personal reputation." (Doc. 40, ¶ 111) In a similarly conclusory fashion, the plaintiff alleges that "members of the Englewood Hospital administration and Medical Staff conspired with Defendants Dr. Chace, Dr. Gutierrez, and Dr. Pfahler to prevent [the plaintiff] from filling the office of Vice-Chair . . . because [the plaintiff] was a minority physician." The plaintiff alleges that Brandon

refused to act on the plaintiff's complaints of discrimination. But the plaintiff alleges no fact to support any of these defendants' racial animus. Although perhaps consistent with the defendants' purposefully discriminating against the plaintiff, the allegations "do not plausibly establish this purpose." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009).

The plaintiff apparently attempts to show the defendants' racial animus by describing a racially hostile work environment.[1] These claims reduce to an allegation that the plaintiff is East Indian and was subject to disparaging remarks about East Indians and other racial minorities. With one exception, however, no defendant uttered or was present when another person uttered any of the discriminatory remarks. The lone exception is Meade's referring to DiTomaso as "The Great White Hope." But the plaintiff provides no detail about the context of the remark or the frequency of similar remarks, if any.[2] Meade recruited DiTomaso in 2004, and the plaintiff alleges no repetition of the remark since DiTomaso's recruitment. Furthermore, the allegations concerning Wessels and Daniels fail to substantiate the plaintiff's claim because the conclusory allegations fail to establish any defendant's knowledge of the remarks. The plaintiff's "naked assertion" without "further factual enhancement" fails to state a facially

---

[1] A discrimination claim under Section 1981 is analyzed under the same framework as a claim under Title VII of the Civil Rights Act of 1964. Spring v. Convergys Customer Mgmt. Group, Inc., 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

[2] To the extent the plaintiff attempts to plead a hostile work environment, the plaintiff must allege offending behavior that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). The plaintiff's allegation of a single offensive remark by defendant Meade fails plausibly to demonstrate that Meade's remarks were so severe or pervasive so as to create an abusive environment. Additionally, the complaint specifically alleges a non-discriminatory (although illegal) motivation for Meade's recruitment of DiTomaso—Meade could force DiTomaso to use the allegedly unnecessary anesthesiology service.

plausible claim against Meade or any other defendant.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The plaintiff's "formulaic recitation of the elements" fails to state claim for discrimination.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Accordingly, Count I is **DISMISSED**.

### The Section 1985(3) Conspiracy Claim

Count II asserts a conspiracy under 42 U.S.C. § 1985(3).  "The elements of a cause of action under Section 1985(3) are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Trawinski v. United Techs., 313 F.3d 1295, 1299 (11th Cir. 2002) (citation and internal quotation marks omitted).  Section 1985(3)'s second element, that is, "the language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).  Additionally, to be actionable under Section 1985(3), a conspiracy among private persons "requires an intent to deprive persons of a right guaranteed against private impairment," Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 274 (1993), and the protected right must be consciously targeted rather than merely incidentally affected, Bray, 506 U.S. at 275-76.

"Section 1985(3) . . . creates no rights. It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 376 (1979) (holding that a "deprivation of a right created by Title VII [of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.] cannot be the basis for a cause of action under § 1985(3)");[3] see also Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 527 (2d Cir. 1996) (holding that "a violation of the [Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ] . . . cannot be the basis for a claim under § 1985(3)."). In the context of an action against private conspirators under § 1985(3), the Supreme Court recognized only two rights protected against private impairment: the right to be free from involuntary servitude and the right to interstate travel. See Bray, 506 U.S. at 278.

Although holding that a deprivation of a right created by Title VII cannot form the basis of a claim under Section 1985(3), Novotny declined to decide "whether § 1985(3) creates a remedy for statutory rights other than those fundamental rights derived from the Constitution." Novotny, 442 U.S. at 370 n.6. Further, Novotny's reasoning (that allowing a claim under Section 1985(3) based on a violation of Title VII would impair the effectiveness of the enforcement and conciliation scheme created by Congress for claims under Title VII) does not directly apply to a statutory right (e.g., the right to enter

---

[3] See also Great American Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979) ("Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates.").

- 11 -

and enforce a contract under 42 U.S.C. § 1981(a)) for which Congress has established no similar enforcement and conciliation scheme.  Accordingly, whether a deprivation of a right secured by Section 1981(a) may provide the basis of a Section 1985(3) conspiracy remains unsettled.  See Jenkins v. Arcade Bldg. Maint., 44 F. Supp. 2d 524, 532-33 (S.D.N.Y. 1999).  However, because a claim for race discrimination in employment brought under Title VII cannot form the basis for a § 1985(3) conspiracy claim, the same claim should not survive "simply because it is brought under § 1981." Jenkins, 44 F. Supp. 2d at 533.  More important, as Jenkins notes, Justice Stevens's concurrence in Novotny provides powerful support for precluding a Section 1985(3) claim based on a deprivation of rights guaranteed by Section 1981(a).  The language and history of Sections 1 and 2 of the Civil Rights Act of 1871 (the predecessor of 42 U.S.C. §§ 1983 and 1985, respectively) compel the conclusion that "the Congress which enacted both provisions was concerned with providing federal remedies for the deprivations of rights protected by the Constitution and, in particular, the newly ratified Fourteenth Amendment."  Novotny, 442 U.S. at 382-83 (Stevens, J., concurring).  The congressional concern with redressing constitutional violations strongly suggests that Section 1985(3) was not "intended to provide a remedy for the violation of statutory rights—let alone rights created by statutes that had not yet been enacted."  Novotny, 442 U.S. at 385 (Stevens, J., concurring).[4]  Finally, the weight of persuasive authority

---

[4] See also Novotny, 442 U.S. at 379 (Powell, J., concurring) (concluding, "[f]or essentially the reasons suggested by Mr. Justice Stevens," that Section 1985(3) should not be construed "to provide a remedy generally for the violation of subsequently created statutory rights" and that "its reach is limited to conspiracies to violate those fundamental rights derived from the Constitution"); Novotny, 442 U.S. at 381
(continued...)

supports the view that Section 1985(3) provides no remedy for a deprivation of rights protected by Section 1981(a).[5]

In short, because Section 1985(3) provides no remedy for a violation of rights protected by Section 1981(a), and particularly for rights not protected by Section 1981(a) until long after the enactment of Section 1985(3),[6] Count I fails to the extent that it depends on the defendants' alleged conspiracy to impair the plaintiff's rights under Section 1981(a). Finally, the plaintiff cannot premise a private conspiracy claim under

---

(...continued)
(Powell, J., concurring) ("I would take advantage of the present opportunity to make clear that this Civil War Era statute was intended to provide a remedy only for conspiracies to violate fundamental rights derived from the Constitution.").

[5] See Tardd v. Brookhaven Nat. Lab., 407 F. Supp. 2d 404, 413 (E.D.N.Y. 2006) ("Section 1981 cannot form the basis of a conspiracy under Section 1985(3)."); Abdi v. Brookhaven Science Assocs., LLC, 447 F. Supp. 2d 221, 227 (E.D.N.Y. 2006) ("[A]n alleged violation of § 1981 cannot form the basis of a conspiracy under § 1985(3)."); Benton v. Cousins Props., Inc., 230 F. Supp. 2d 1351, 1382-84 (N.D. Ga. 2002), aff'd, 97 Fed. App'x 904 (11th Cir. 2004) (table decision); Ayers v. Intown Suites Mgmt, Inc., No. 1:05-cv-1528-JOF, 2006 WL 783352, at *4 (N.D. Ga. Mar. 21, 2006) ("Plaintiff cannot use 42 U.S.C. § 1985(3) as a vehicle for bringing a 42 U.S.C. § 1981 claim."); Brown v. Philip Morris Inc., 250 F.3d 789, 805-06 (3d Cir. 2001) (noting that the "[t]he great weight of precedential authority . . . supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action," but declining to resolve the issue because the plaintiff failed in any event to state a claim under Section 1981 or Section 1982).

[6] The Civil Rights Act of 1991, Pub. L. No. 102-166 § 101, 105 Stat. 1071 § 101 (1991), amended Section 1981 in response to Patterson v. McLean Credit Union, 491 U.S. 164 (1989). Patterson held that Section 1981's protection of the right "to make and enforce contracts" covered "only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process," 491 U.S. at 179, and not "conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations," 491 U.S. at 171 (emphasis added). The Civil Rights Act of 1991 amended Section 1981 to broaden the definition of "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); see also Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994) (Section 1981's prohibition against racial discrimination now "applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations"). The plaintiff's allegations of a conspiracy to interfere with his contract with the hospital describes the kind of "post-formation . . . incidents relating to the conditions of employment" not actionable under Section 1981 as originally enacted. See Patterson, 491 U.S. at 178.

- 13 -

Section 1985(3) on an intent to deprive the plaintiff of rights protected by the Fourteenth Amendment, which rights are not guaranteed against private impairment. Because the plaintiff presents no other basis for his Section 1985(3) claim, Count II is **DISMISSED**.

## Conclusion

The motion (Doc. 41) to dismiss is **GRANTED** to extent that Counts I and II are **DISMISSED**. Pursuant to 28 U.S.C. § 1367(c), supplemental jurisdiction of the plaintiff's state-law claims in Counts III through VIII is **DECLINED**, and the plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.[7] The Clerk is directed to (1) terminate any pending motion and (2) close the case.

ORDERED in Tampa, Florida, on October 21, 2009.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[7] Pursuant to 28 U.S.C. § 1367(d), "The period of limitations for any claim asserted under [Section 1367(a)], and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under [Section1367(a)], shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

- 14 -